# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO. 1:16CR329 |
| | ) | |
| | ) | |
| PLAINTIFF, | ) | JUDGE SARA LIOI |
| | ) | |
| vs. | ) | |
| | ) | MEMORANDUM OPINION |
| EDWARD R. HILLS, et al., | ) | |
| | ) | |
| | ) | |
| DEFENDANTS. | ) | |

Before the Court are the renewed motions of defendants, Edward R. Hills ("Hills"), Sari Alqsous ("Alqsous"), Yazan B. Al-Madani ("Al-Madani"), and Tariq Sayegh ("Sayegh"), for judgment of acquittal. (Doc. No. 352 ["Hills Mot."]; Doc. No. 350 ["Alqsous Mot."]; Doc. No. 351 ["Al-Madani Mot."]; Doc. No. 336 ["Sayegh Mot."].) Alqsous alternatively seeks a new trial. (*See* Alqsous Mot.) The United States of America ("government") has filed a consolidated response in opposition to these motions. (Doc. No. 356 ["Opp'n"].)

## I. BACKGROUND

On July 27, 2018, after a five-week jury trial, Hills, Alqsous, and Al-Madani were each found guilty of sixteen or more counts. Sayegh was found guilty of five counts. The charges related to defendants' employment as dentists at MetroHealth Hospital, a public hospital receiving federal and state funding. The crimes of which defendants were found guilty included: RICO conspiracy, conspiracy to commit mail and wire fraud and honest services mail fraud, Hobbs Act conspiracy, bribery concerning programs receiving federal funds, solicitation or receipt of healthcare kickbacks, and obstruction of justice. Hills was also convicted of multiple

counts of filing false tax returns, and Al-Madani was separately convicted of making false statements to a federal officer. (Doc. No. 337 (Hills Verdicts); Doc. No. 338 (Alqsous Verdicts); Doc. No. 339 (Al-Madani Verdicts); Doc. No. 340 (Sayegh Verdicts).) Sentencing for the defendants is currently scheduled for January 2019.

At all times relevant to the indictment, Hills served in positions of authority at MetroHealth, first as Chair of the Dental Department and eventually also filling the role of Chief Operating Officer. He also, at various times, served in a leadership role on the Ohio State Dental Board. Alqsous, Al-Madani, and Sayegh were foreign-born dentists who came to work in Hills' department. During the course of the trial, the government presented testimony from more than 50 witnesses, as well as documentary evidence that included wire transfers, financial and employment records, text messages, and wiretaps, demonstrating that defendants engaged in a pattern of corrupt and fraudulent activity through a number of schemes.

An overarching theme to the schemes was Hills' use of his authority to generate benefits for himself and his co-defendants. Under the "stream of benefits" scheme, Hills solicited and received from Alqsous, Al-Madani, and a third foreign-born dentist, Hussein Elrawy, valuable items including: cash, a free apartment for his girlfriend, plane and sporting event tickets, a Louis Vuitton briefcase, expensive dinners, and prescription medication. In exchange for these benefits, Hills benefited the group by influencing incentive bonuses, work schedules, and hiring certain residents into the dental program. Other schemes that are particularly relevant to defendants' post-trial motions involved the solicitation of bribes from applicants to the dental residency program at MetroHealth ("resident bribery" scheme), the receipt of patient referrals from MetroHealth to defendants' private clinics ("patient referrals kickback" scheme), and the

illegal use of MetroHealth facilities to support Hills' private dental remediation business—Oral Health Enrichment ("Oral Health Enrichment" scheme).

At the close of the government's case, each defendant moved for judgment of acquittal under Rule 29(c) of the Federal Rules of Criminal Procedure. Over a two-day period, the Court heard extensive argument from counsel on the motions before finding that the government had presented ample evidence based upon which a reasonable jury could find guilt beyond a reasonable doubt as to each charge asserted against Hills and Alqsous, as well as the majority of the charges against Al-Madani and Sayegh. The Court reserved ruling on Count 6, as it pertained to Al-Madani, and Counts 3, 4, and 5, as they pertained to Sayegh.

## II.  STANDARDS OF REVIEW

### A.  **Rule 29(c)**

Each defendant has now renewed his Rule 29(c) motion. If the defendant moves for a judgment of acquittal after the government concludes its case, the Court "must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a). "The relevant inquiry is whether, 'viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *United States v. Fisher*, 648 F.3d 442, 450 (6th Cir. 2011) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979) (emphasis in original)). "Under the *Jackson v. Virginia* standard, a reviewing court does 'not reweigh the evidence, re-evaluate the credibility of witnesses, or substitute [its] judgment for that of the jury.'" *Id*. (quoting *Brown v. Konteh*, 567 F.3d 191, 205 (6th Cir. 2009)). "'Substantial and competent circumstantial evidence by itself may support a verdict and need not remove every

3

reasonable hypothesis except that of guilt.'" *Id.* (quoting *United States v. Lee*, 359 F.3d 412, 418 (6th Cir. 2004)).

B.    **Rule 33(a)**

Alqsous has also moved in the alternative for a new trial. A motion for a new trial is governed by Rule 33, which provides that the court may "vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). "The paradigmatic use of a Rule 33 motion is to seek a new trial on the ground that 'the [jury's] verdict was against the manifest weight of the evidence.'" *United States v. Munoz*, 605 F.3d 359, 373 (6th Cir. 2010) (quoting *United States v. Crumb*, 187 F. App'x 532, 536 (6th Cir. 2006)). "Generally, such motions are granted only 'in the extraordinary circumstance where the evidence preponderates heavily against the verdict.'" *United States v. Graham*, 125 F. App'x 624, 628 (6th Cir. 2005) (quoting *United States v. Turner*, 490 F. Supp. 583, 593 (E.D. Mich. 1979)). Under this type of challenge, the district judge may act as a "thirteenth juror," assessing the credibility of witnesses and the weight of the evidence. *United States v. Lutz*, 154 F.3d 581, 589 (6th Cir. 1998). "The defendant bears the burden of proving the need for a new trial and such motions should be granted sparingly and with caution." *Turner*, 995 F.2d at 1364.[1]

Thus, while Rule 29(c) and Rule 33(a) may deal with similar issues, the two rules are governed by different standards of review. When assessing a motion for judgment of acquittal,

---

[1] Rule 33's "interest of justice" standard also "allows the grant of a new trial where substantial legal error has occurred." *Munoz*, 605 F.3d at 373. This includes "any error of sufficient magnitude to require reversal on appeal." *Id.* (quoting *United States v. Wall*, 389 F.3d 457, 474 (5th Cir. 2004)). The trial court does not assume the role of the "thirteenth juror" for purposes of this type of challenge. *Id.* at 373 n.9. Because Alqsous relies exclusively on the "against the weight of the evidence" theory in his motion for a new trial, the Court shall apply the standard applicable to such a claim.

4

pursuant to Rule 29(c), a court is required to approach the evidence from a standpoint most favorable to the government, and to assume the truth of the evidence offered by the prosecution. With a Rule 33(a) motion for new trial on the ground that the verdict is against the weight of the evidence, the power of a court is much broader because a court may weigh the evidence and consider the credibility of the witnesses. *See Turner*, 490 F. Supp. at 593 (citing 2 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 553 (3d ed. 2004)).

### III. RULE 29(C) MOTIONS OF HILLS AND ALQSOUS

In their Rule 29(c) motions, Hills and Alqsous offer no new arguments, and, instead, elect to rely exclusively on the arguments they made in their original motions, all of which the Court has already considered and rejected on the record. The renewed motions fail for the same reasons as the original motions, and the Court expressly incorporates its earlier bench rulings in full in denying the renewed motions.

The government presented at trial both direct and circumstantial evidence that detailed each defendant's substantial roles in the fraudulent schemes. The jury heard testimony from dentists who had either been solicited by Alqsous and co-conspirators for bribes, or those who had been improperly permitted by Hills to use MetroHealth facilities for purposes of remediating their licenses through Hills' private business—Oral Health Enrichment. The jury also heard testimony from present and former MetroHealth employees regarding the prohibition on using MetroHealth facilities or dentists for private enterprises or the limitations on working at private clinics while receiving a salary from MetroHealth. Additionally, there was considerable testimony and documentation tracing the stream of benefits to Hills, the kickbacks from patient referrals to Alqsous' private clinics, the MetroHealth dentists who worked at Alqsous' private

clinics while employed at MetroHealth, the free dental work Alqsous and others performed at MetroHealth for Hills' attorney, both defendants' efforts to obstruct justice, and Hills' false tax returns. The evidence, direct and circumstantial, fully supports the jury's guilty verdict as to each charge. The renewed Rule 29(c) motions of Hills and Alqsous are DENIED.

### IV. ALQSOUS' RULE 33 MOTION

In support of his belief that the evidence "overwhelming demonstrated that Dr. Alqsous was not guilty of counts 1-5, 8, 13, 21-29," Alqsous offers only the following:

> Numerous witnesses testified against him. Yet, all were impeached and many had a demonstrable bias against him or had changed their stories. Many texts were offered against him. Yet, many of these texts were unsupported by the witnesses or were clearly taken out of context (e.g., lol designations at the end of the texts).

(Alqsous Mot. at 6239.[2])

This vague and undeveloped argument falls woefully short of meeting the considerable burden of demonstrating the extraordinary circumstances necessary to overturn the jury's verdict as to these counts. It is true that Alqsous and the other three defendants were permitted to test witness bias on cross-examination, and, in fact, the Court afforded counsel considerable latitude to explore a variety of defense theories. Still, the jury heard credible testimony regarding Alqsous' efforts to solicit bribes from applicants to the dental residency program, how Alqsous' clinics—Buckeye Family Dental and Noble Dental—benefitted from illegal patient referrals for kickbacks and the free labor of MetroHealth resident dentists, how Alqsous often oversaw many of the dentists that improperly used MetroHealth facilities to perform remediation work through Hills' private business, and how Alqsous, Al-Madani, and Elrawy gave things of value to Hills.

---

[2] Unless otherwise noted, all page number references are to the page identification number generated by the Court's electronic docketing system.

Much of this testimony was supported by documentation, including monetary wire transfers that were matched with text messages exchanged between the co-conspirators.

Serving as the "thirteenth juror" on a Rule 33 motion, the Court observes that it found persuasive the testimony of several dentists, such as Ahmad Alsaad and Issa Salameh, who testified that Alqsous directly approached them to solicit a bribe. While Issa Salameh elected not to pay the bribe to ensure his sister a spot in the residency program, Alsaad did, and he testified to his own incriminating illegal activity without any promise of immunity from the government. His testimony was also supported by wire transfers. Additionally, numerous dentists and MetroHealth employees with no apparent bias or interest in the outcome of the criminal trial testified consistently as to Alqsous' role in overseeing the activity at MetroHealth of the dentists receiving remediation training through Oral Health Enrichment and the March 2014 directive from Hills that redirected MetroHealth patients to the private clinic owned by Alqsous and Al-Madani, Buckeye Family Dental.

The Court found especially compelling the testimony of Hussein Elrawy, a dentist and unindicted co-conspirator. (*See, generally* Doc. No. 336-5 (Transcript of Testimony of Hussein Elrawy ["Elrawy Tr."]).[3]) He testified as to how he, Alqsous, and Al-Madani would provide things of value to Hills and Hills' girlfriend, in exchange for work incentives that were determined entirely by Hills. Specifically as to Alqsous, Elrawy explained that Hills arranged for Alqsous to receive credit for the majority of the lucrative initial patient visits for dentures.[4] He

---

[3] Due to a filing error, the only available citation for this transcript is the citation generated by the court reporter.

[4] Elrawy and other witnesses testified that the creation of dentures usually took five dental visits but was billed at the first visit, known as the "D1" visit. The dentist who received credit for the D1 visit was also credited with all of the subsequent visits, even if he did not personally attend to the patient during these later visits.

also testified to how they received patient referrals to their private clinics from Hills, and how Hills arranged for MetroHealth resident dentists to work in their private clinics.

Elrawy's testimony also covered the resident bribery scheme and detailed Alqsous' involvement in soliciting bribes from applicants. He further explained how he and others were encouraged to support certain resident's applications, even if they were not the highest scoring candidates. For example, he testified that a position was actually created for Lufti Nassar, a dental application whom he understood to be "Sari [Alqsous'] boy." (Elrawy Tr. at 104.) This, and other aspects of Elrawy's testimony was substantially corroborated by other witnesses. The fact that Elrawy was intimately involved, along with Alqsous and Al-Madani, with many of the schemes and testified to this involvement without any promises from the government, made him a particularly credible witness.

Based on this evidence, the Court concludes that the interests of justice do not require a new trial for Alqsous, nor were the jury's guilty verdicts against the manifest weight of the evidence. *See* Fed. R. Crim. P. 33(a). This is not a case in which extraordinary circumstances and the evidence preponderates heavily against the verdicts. *See United States v. Hughes*, 505 F.3d 578, 593 (6th Cir. 2007). Accordingly, Alqsous' motion for a new trial is DENIED.

## V.  THE RENEWED RULE 29(C) MOTIONS OF SAYEGH AND AL-MADANI

Sayegh seeks a judgment of acquittal on Count 3 (conspiracy to commit bribery concerning programs receiving federal funds), Count 4 (conspiracy to commit honest services mail and/or wire fraud), and Count 5 (bribery concerning programs receiving federal funds). Al-Madani requests acquittal on Count 6 (bribery concerning programs receiving federal funds involving Firas Yacoub), Count 7 (bribery concerning programs receiving federal funds

8

involving Yazan Karadsheh), and Count 8 (conspiracy to commit money and property mail and/or wire fraud).

Counts 3-7 relate to the resident bribery scheme, wherein defendants were alleged to have solicited and facilitated bribes from applicants to MetroHealth's dental residency program. It was the government's theory that defendants targeted foreign-trained dentists, mostly from Jordan and Egypt, and often with ties to one or more of the defendants, and then pressured them to make a sizeable "donation" in order to ensure their acceptance into the program.[5] While the targeted applicants were often told that the donation would go to MetroHealth, it actually went to benefit one or more of the defendants. The final count, Count 8, relates to the Oral Health Enrichment scheme.

With respect to Counts 3-7, the government presented evidence involving four different applicants who were approached for the purposes of soliciting a bribe. The first bribe about which the jury heard testimony was the bribe paid by Ahmad Al Saad. Alqsous and Al Saad— both Jordanian dentists and close friends—applied to dental residency programs in the United States in 2007-2008. While Alqsous was accepted into MetroHealth's residency program in 2008, Al Saad was not initially accepted. Before starting his residency, Alqsous meet with Al Saad in a coffee shop in Amman. Alqsous told his friend that he could get him into the program with a $20,000 donation, assuring him that he would not be the first applicant to have to make such an additional payment to gain entrance to the program. (Doc. No. 356-1 (Transcript of Testimony of Ahmad Al Saad ["Al Saad Tr."]) at 6907.) Al Saad eventually agreed to pay the

---

[5] According to the testimony at trial, foreign-trained dentists were required to participate in a residency program before they could be licensed to practice dentistry in the United States. While most residency programs required the resident to pay tuition to attend, MetroHealth's program was somewhat unique in that it paid each resident a salary. As a result, it was a popular program with foreign dentists.

bribe in incremental payments of $5,000, making the first installment to Alqsous in November 2008.

Al Saad testified that in December 2008 he flew to Cleveland for his interview and stayed with Alqsous and Sayegh. Al-Madani was on his interview panel. Following the interview, Al Saad wired the second $5,000 payment to Alqsous in January 2009. Al Saad paid the third installment after he was accepted in March 2009. When Al Saad started at MetroHealth in Summer 2009, Alqsous told him that "he [Alqsous] took the last $5,000 from Dr. Sayegh, and he donated that money to the MetroHealth Hospital. And [Alqsous] asked me to pay the money back, so he can give it to Tariq Sayegh." (*Id.* at 6947.)

The second solicited applicant discussed at trial was Yazan Karadsheh, a Jordanian dentist who applied to MetroHealth in Fall 2010. Karadsheh visited MetroHealth in November 2010 and stayed with Sayegh, whom he had met through Al Saad. (Doc. No. 356-5 (Transcript of Testimony of Yazan Karadsheh ["Y. Karadsheh Tr."]) at 7557-58.) During the visit, Sayegh told Karadsheh that "if you paid a certain amount of money as a contribution to the program you are going to like most likely get accepted." (*Id.* at 7559.) After some negotiations, Karadsheh agreed to pay $10,000. (*Id.* at 5761.) Sayegh arranged with Karadsheh to have Karadsheh's father, Fu'ad, make the payment to Sayegh's brother, Raed, in Jordan. Fu'ad testified that, after he received a call from his son, he paid the money to Raed Sayegh. (*Id.* at 7562-64.)

10

Two weeks before the official "match" results[6] were released, on January 14, 2011, Karadsheh received a Facebook message from Al-Madani asking Karadsheh to call him. Karadsheh testified that, during the call that followed, Al-Madani "basically [told] me that I got into the program." (*Id*. at 7564-66; Gov. Ex. 1206.) Sometime later, during Karadsheh's residency, Sayegh chided Karadsheh for a dispute he was having with Alqsous. Sayegh instructed Karadsheh to "listen to [Alqsous], and be better with him and everything because he is the one that got you into the program." (*Id*. at 7571-72.) After MetroHealth opened its investigation into the dental department in 2014, Al-Madani called a meeting with Karadsheh in a mall parking lot, cautioning him against cooperating. (*Id*. at 7576 [Al-Madani told Karadsheh, "this is a serious issue, like a really serious issue, the investigation, don't talk with anybody because I mean it is serious, you might get deported."].)

The third applicant the jury heard testimony regarding was Firas Yacoub, a Jordanian-trained dentist who was in the same applicant pool as Karadsheh. Prior to visiting Cleveland, the only person Yacoub knew from MetroHealth was Al-Madani, who also served on his interview panel. Yacoub testified that Al-Madani was a relative of one of Yacoub's close friends, though he had never met Al-Madani before coming to the United States. (Doc. No. 356-8 (Transcript of Testimony of Faris Yacoub ["F. Yacoub Tr."]) at 8161, 8163, 8233.) When he returned to Jordan

---

[6] At trial, the jury heard considerable testimony regarding the process of "matching" resident applicants with the various residency programs. Witnesses testified that, once the application process is complete and applicants are interviewed, the applicants rank the programs in their order of preference and the residency programs provide a similar ranking of the applicants. Taking these rankings into consideration, the match process is designed to match the applicant with an appropriate program.

in December 2010, he was surprised to receive a phone call from Sayegh because, though he had met him during his visit, he "didn't give out [his] Jordanian number when [he] was in Cleveland." (*Id*. at 8165-66.) He testified that Sayegh told him that MetroHealth "is a very tough competitive program [and] if I am willing to give like a donation to like a group of people that are associated with the hospital, they ca[n] help support my application." (*Id*. at 8166.)  When Yacoub asked about the identity of the members of the "group," Sayegh responded that Yacoub did not "have to know at this point." (*Id*. at 8167.) Sayegh eventually requested a $20,000 "donation" that he agreed could be paid in increments. (*Id*. at 8167, 8172.) Karadsheh made an initial payment to Sayegh's brother in Jordan, and the remaining payments were made to Sayegh directly between 2011 and 2014. (*Id*. at 8173-6; *see, e.g*., Gov. Ex. 1301.)

The evidence relating to the final solicited bribe was introduced, in large part, through the testimony of Issa Salameh. Issa Salameh was a Cleveland dentist and a one-time friend of Alqsous, Al-Madani, and Sayegh. (Doc. No. 356-6 (Transcript of Testimony of Issa Salameh ["I. Salameh Tr."]) at 7734.)[7] He testified that in 2011 he spoke with Sayegh at the Pasha Café in Cleveland, Ohio, and asked for his assistance with the application of his sister, Seim, by putting in a good word for her.  (*Id*. at 7736-37.) Sayegh told Issa that he could not help and directed him to Alqsous. (*Id*. at 7740, 7832-33.) Issa left the coffee shop with Alqsous, who informed Issa that he would have to make a $25,000 payment to Hills to ensure his sister a spot in the program. (*Id*. at 7740-41.) Later, citing their friendship, Alqsous agreed to reduce the amount to $20,000. (*Id*. at 7745.)

---

[7] Issa testified that he had gone to school with Sayegh in Jordan, and Sayegh was the only person he knew when he first came to Cleveland, Ohio. (I. Salameh Tr. at 7733.) He testified that Sayegh eventually became a "good friend," a "very close friend and with all residents at MetroHealth." (*Id*. at 7736.)

Issa and Seim never agreed to pay the bribe. A few days before the match results were released, Sayegh visited Issa's home. During the visit, Sayegh brought up Seim's application and said, "the process is very competitive this year." He then asked Issa, "did you take care of that with Sari [Alqsous] so they can guarantee to you the position for [Seim]?" (*Id*. at 7770.) Based on this conversation, Issa believed that Sayegh was "aware of what's going on, you know, what's going on exactly and that Sari [Alqsous] asked me for the money." (*Id*. at 7771.)

## A.      Counts 3-5 (Sayegh's Motion)

Counts 3 and 4 were each charged as a conspiracy. In accordance with the Sixth Circuit's pattern instructions, the Court instructed the jury that the elements of a conspiracy are that (1) two or more persons conspired, or agreed, to commit a substantive crime, and (2) the defendant knowingly and voluntarily joined the conspiracy. (Doc. No. 360 (Transcript of Jury Instructions ["J.I. Tr."]) at 8346.) *See* Sixth Circuit Pattern Instruction 3.01(A).

"To prove that a conspiracy existed, the government need not show a formal written agreement." *Fisher*, 648 F.3d at 450 (citing *United States v. Crossley*, 224 F.3d 847, 856 (6th Cir. 2000)). "A showing of 'tacit or mutual understanding among the parties' is sufficient." *Id.* (quoting *Crossley*, 224 F.3d at 856). "Likewise, direct evidence of the conspiracy is not necessary. It is enough to present '[c]ircumstantial evidence which a reasonable person could interpret as showing participation in a common plan[.]'" *United States v. Hunt*, 521 F.3d 636, 647 (6th Cir. 2008) (quoting *Crossley*, 224 F.3d at 856); *see United States v. Walls*, 293 F.3d 959, 967 (6th Cir. 2002) (internal citations omitted) ("A conspiracy may be inferred from circumstantial evidence which may reasonably be interpreted as participation in a common plan.").

13

"[A] conspiracy may be inferred from acts done with a common purpose [and] [i]t is only necessary that a defendant know of the conspiracy, associate himself with it, and knowingly contribute his efforts to its furtherance." *United States v. Barger*, 931 F.2d 359, 369 (6th Cir. 1991) (internal citations omitted). "[I]t is not necessary for each conspirator to participate in every phase of the criminal venture, provided there is assent to contribute to the common enterprise." *United States v. Hughes*, 895 F.2d 1135, 1140 (6th Cir. 1990).

Viewing the evidence in a light most favorable to the government, the Court finds that a rational juror could conclude that the conspiracies charged in Counts 3 and 4 existed and that Sayegh knowingly and voluntarily joined the conspiracies. Beginning with Al Saad's testimony, a rational juror could find from Alqsous' comment that Al Saad would not be the first applicant to make a "donation," a pre-existing bribery scheme that Sayegh knowingly joined and to which he contributed by providing the last $5,000 payment on Al Saad's behalf. Similarly, Yacoub's testimony that Sayegh called him and asked him to make a contribution to "a group of people that are associated with the hospital [who would] help support" his application would also have established both the existence of a conspiracy among others and Sayegh's association with and contribution to it.[8]

Finally, the evidence involving Issa and Seim Salameh provided the basis for a reasonable jury to find Sayegh guilty of both the conspiracy and the underlying substantive

---

[8] The evidence surrounding the bribe of Yazan Karadsheh would also permit a rational juror to find both elements of a conspiracy satisfied as to Sayegh. Specifically, Sayegh's comment to Karadsheh that he should "listen to [Alqsous], and be better to him and everything because he is the one that got you into the program," could have been interpreted by the rational juror to mean that Alqsous was involved in a conspiracy whose goal it was to get applicants like Karadsheh into the program following the payment of a bribe.

offense charged in Count 5. While Sayegh notes that he specifically told Issa in the coffee shop that he could not help Seim, the fact remains that, in the same breath, he directed Issa to Alqsous, who immediately solicited from Issa a bribe. When Issa and Seim did not pay the bribe, Sayegh followed up by visiting Issa at his home immediately before the announcement of the match results to encourage him to pay, saying "the process is very competitive this year [and] did you take care of that with Sari so they can guarantee to you the position for" Seim.[9] From this the jury could have reasonably concluded that Sayegh had joined a conspiracy to elicit a bribe and contributed to its goal by pressuring Issa to pay to ensure a good outcome for his sister.

Still, Sayegh argues that the evidence falls short as to these counts because "[t]here were no text, emails, or testimony to satisfy [the elements of a conspiracy]. Nor is there any evidence of any mutual spoken or unspoken understanding to commit the substantive crime." (Sayegh Mot. at 5208.) However, the government was not required to present direct evidence of a formal agreement. *See Fisher*, 648 F.3d at 450; *Hunt*, 521 F.3d at 647. Instead, the Court properly instructed the jury on how the government could prove a defendant's involvement in the conspiracy:

> Participation in the conspiracy's common purpose and plan may be inferred from a defendant's actions and reactions to the circumstances. And the connection of a defendant to the conspiracy need only be slight, if there is sufficient evidence to establish that connection beyond a reasonable doubt. . . . A defendant's knowledge can be proved indirectly by facts and circumstances which lead to a conclusion that he knew the conspiracy's main purpose.

(J.I. Tr. at 8349-50.) *See* Sixth Circuit Pattern Jury Instructions 3.03.

---

[9] Of course, Sayegh's statement to Issa is very similar to the statement he made to Yacoub, offering further confirmation that Sayegh's efforts were part of a greater conspiracy to secure bribes from dental applicants.

15

As outlined above, the evidence, including Sayegh's own actions and those of his co-defendants of which Sayegh was certainly aware (as evidenced by his own reactions to the circumstances), demonstrated both the existence of the charged conspiracy and Sayegh's willing participation therein. For example, his timely appearance at Issa Salameh's home to pressure him into paying with a full court press immediately before the match results were to be announced could have easily been interpreted by a rational juror as evidence that Sayegh knew the conspiracy's main purpose—the solicitation and collection of bribes from residency applicants—and intended to advance that purpose.[10] Sayegh's motion as to Count 3 and Count 4 is DENIED.

This same evidence was sufficient for a rational juror to find Sayegh guilty of the substantive bribery offense charged in Count 5 as either an accomplice, or, alternatively, under a theory of Pinkerton liability. As to the former, the Court instructed the jury that a defendant could be convicted of a substantive offense he did not personally commit if the following elements were met: (1) that the crime charged was committed, (2) that the defendant helped to commit the crime or encouraged someone else to commit the crime, and (3) that the defendant

---

[10] In his motion, Sayegh argues that Counts 3 and 4 must be overturned because Elrawy testified that when he learned of the bribe solicitation to Issa Salameh, Alqsous offered him money to keep quiet and advised him that the only people who knew about "the money . . . [were] just you and Dr. Hills and myself." This argument is without merit for two reasons. First, the jury was properly instructed that a conspiracy "does not require proof that a defendant knew everything about the conspiracy, or everyone else involved[.] (*See* J.I. Tr. at 8349.) *See* Sixth Circuit Pattern Jury Instruction 3.03(2); *United States v. Grooms*, 194 F. App'x 355, 362 (6th Cir. 2006) (government need not prove that a defendant participated in all aspects of the conspiracy or that he was necessarily aware of his coconspirators' actions taken in furtherance of the conspiracy). Second, the government correctly notes that a rational juror could have also concluded that "the money" referred to the hush money Alqsous offered to Elrawy and not the initial bribe amount solicited from Issa Salameh.

intended to help commit or encourage the crime. (J.I. Tr. at 8353.) *See* Sixth Circuit Pattern Jury Instruction 4.01(2). Again, the evidence demonstrated that Alqsous solicited Issa Salameh for a bribe, and that Sayegh knowingly intended to advance the commission of the crime by directing Issa Salameh to Alqsous and by following up with Issa Salameh when the bribe was not forthcoming. From this, the jury could have reasonably concluded that Sayegh was an accomplice to the crime charged in Count 5.

A rational juror could have also convicted Sayegh in Count 5 under a theory of Pinkerton liability. The Court instructed the jury that a defendant could be convicted of a substantive offense committed by a coconspirator if the following elements were met:

> First, that the defendant was a member of the conspiracy relating to the substantive offense.
>
> Second, that after he joined the conspiracy, and while he was still a member of it, one or more of the other members committed the substantive offense.
>
> Third, that this crime was committed to help advance the crime.
>
> And fourth, that this crime was within the reasonably foreseeable scope of the unlawful project. The crime must have been one that the defendant could have reasonably anticipated as a necessary or natural consequence of the agreement.

(J.I. Tr. at 8351-52.) *See* Sixth Circuit Pattern Jury Instruction 3.10.

As set forth above, Sayegh's actions and reactions to the attendant circumstances demonstrated that he was a member of the conspiracy relating to the substantive bribery offense committed by Alqsous in Count 5. Further, a rational juror could reasonably conclude that Alqsous' solicitation of the bribe from Issa Salameh in 2011, long after Sayegh joined the conspiracy, was committed to help advance the resident bribery scheme and was within the

reasonable scope of that unlawful scheme. Accordingly, the evidence sufficiently established Sayegh's guilt under Pinkerton liability.

For all these reasons, Sayegh's renewed Rule 29(c) motion is DENIED.

### B.    Counts 6-8 (Al-Madani's Motion)

In support of his motion, Al-Madani's offers a review of the evidence that focuses on what he *did not* do. With respect to Count 6, he notes that he did not ask Firas Yacoub for a bribe. (Al-Madani Mot. at 6242.) As to Count 7, Al-Madani points out that Yazan Karadsheh "testified at trial that Dr. Al-Madani had never asked him for money and had never received money from him." (*Id.*) Finally, he argues that the evidence relative to Count 8 suggests that he had only "minimum involvement" with the assessments of the dentists who were using MetroHealth facilities to perform remediation activities through Oral Health Enrichment. (*Id.*) Notwithstanding Al-Madani's observations, the government argues that there was sufficient evidence to convict Al-Madani of each charged offense as a conspirator, an accomplice, or under a theory of Pinkerton liability.

Beginning with Count 7, Al-Madani does not dispute that trial evidence sufficiently established that Sayegh committed the crime charged therein when he solicited Karadsheh in fall 2010 for a "donation" to secure his place in the residency program. (*See* Al-Madani Mot. at 6245-48.) And as to the second and third elements of accomplice liability, the jury heard two separate acts that Al-Madani did to assist Sayegh in soliciting the bribe from Karadsheh. First, two weeks before the match results were due, Al-Madani spoke with Karadsheh by phone to reassure him that he would be selected. The timing of the conversation was significant as Karadsheh had agreed to the bribe but had yet to pay it. A rational juror could have found that

18

this timely piece of encouragement would have given Karadsheh the impression that Sayegh had insiders at MetroHealth that controlled the outcome of the application process and encouraged Karadsheh to follow through with paying the bribe. Second, Al-Madani later contacted Karadsheh and warned him that he could be deported if he spoke with anyone associated with MetroHealth's investigation. A rational juror could have found that this act was intended to protect Sayegh and the ongoing nature of the resident bribery scheme. His motion as to Count 7 is DENIED.

The evidence was also sufficient to convict Al-Madani in Count 6 under Pinkerton liability. Because Al-Madani does not challenge his convictions in Count 3 and Count 4, he cannot dispute either the jury's determination that he was a member of the conspiracy charged therein or, accordingly, the satisfaction of the first Pinkerton element. *See United States v. Dandy*, 998 F.2d 1344, 1357 (6th Cir. 1993) ("where a Rule 29 motion is made on specific grounds, all grounds not specified are waived"). (Doc. No. 1 (Indictment) ¶¶ 201, 264.) Likewise, the third and fourth Pinkerton elements are satisfied, as the bribery of Yacoub both clearly advanced the underlying resident bribery conspiracy and was within the reasonably foreseeable scope of that conspiracy.

As to the second element, the evidence established that Sayegh contacted Yacoub in December 2010 to solicit a bribe. Yacoub testified that he was surprised to receive Sayegh's phone call because he had not given his Jordanian phone number to anyone in Cleveland. A reasonable juror could have concluded that Al-Madani, who had sat on Yacoub's interview panel and would have, therefore, had access to Yacoub's contact information, gave Sayegh Yacoub's Jordanian telephone number for the purpose of soliciting Yacoub for a bribe. The reasonableness

of such a conclusion is buttressed by the fact that Al-Madani was the relative of one of Yacoub's close friends. Al-Madani's decision to exploit this connection and target Yacoub for a bribe would have been entirely consistent with the government's theory that the conspirators utilized such connections to select their marks. Because only a "slight" connection is necessary to establish membership in a conspiracy, the reasonable juror could have concluded that Al-Madani had joined the conspiracy, at the latest, when he gave the phone number to Sayegh, thus making him a member of the conspiracy when the bribe was solicited and satisfying the second element of Pinkerton liability. Because the evidence established all four elements of Pinkerton liability, Al-Madani's motion for acquittal as to Count 6 is DENIED.

Count 8 was charged as a conspiracy to commit fraud in connection with Oral Health Enrichment. As previously discussed, Oral Health Enrichment was a private business owned by Hills that provided remediation services for dentists who, as a result of patient complaints or inquires by a governing dental board, were required to demonstrate certain competencies in order to restore their licenses to practice dentistry. At trial, the jury heard testimony from dentists who engaged Oral Health Enrichment for the purposes of remediating their licenses, and had been directed to use MetroHealth facilities to satisfy the clinical portion of their remediation. The jury also heard testimony from MetroHealth employees who observed non-MetroHealth dentists undergoing clinical assessments at MetroHealth, using MetroHealth facilities and supplies, as well as testimony that Oral Health Enrichment did not have permission to use MetroHealth facilities, supplies, or employees for such endeavors.

Al-Madani does not challenge the existence of the conspiracy, or the resulting fraudulent use of MetroHealth and its staff by Ohio Health Enrichment—only his connection to the

conspiracy. He argues that the evidence, at most, established that he performed "a few clinical assessments with non-MetroHealth dentists. Many witnesses did not identify Dr. Al-Madani as a person who would" conduct their assessments on behalf of Oral Health Enrichment. (Al-Madani Mot. at 6248.) He further notes that Oral Health Enrichment employee Julia Solooki testified that Al-Madani "was not someone that facilitated a lot with Oral Health enrichment." And she did not remember ever paying Al-Madani for his services to Oral Health Enrichment. (*Id.* at 6249.) Distilled to its essence, Al-Madani's argument is that he was not as involved as his co-conspirators, Hills and Alqsous.

This argument is without merit. "Once a conspiracy is established beyond a reasonable doubt, a particular defendant's connection to the conspiracy 'need only be slight.'" *United States v. Conatser*, 514 F.3d 508, 518 (6th Cir. 2008) (quoting *United States v. Avery*, 128 F.3d 966, 971 (6th Cir. 1997)); *see* Sixth Circuit Pattern Jury Instructions 3.03(2) (The government need not prove that defendant "played a major in the conspiracy, or that his connection to it was substantial. A slight role or connection may be enough."); *see, e.g., United States v. Price*, 258 F. App'x 539, 545-46 (6th Cir. 2001) (finding that participation in even one drug sale was sufficient to establish membership in drug conspiracy). Here, Thandeka Cox testified that on "five or ten occasions," she saw Alqsous or Al-Madani supervising non-MetroHealth dentists at MetroHealth. (Doc. No. 356-2 (Transcript of testimony of Thandeka Cox ["Cox Tr."]) at 7274-75.) Similarly, Solooki testified that while she primarily worked with Alqsous, she remembered Al-Madani facilitating a few times. (Doc. No. 356-7 (Transcript of Testimony of Julia Solooki ["Solooki Tr."]) at Internal Page Nos. 58, 205.) This testimony was certainly sufficient for a jury to find that Al-Madani had at least a "slight role" in the conspiracy.

21

Nor does the lack of evidence that Al-Madani was ever paid by Oral Health Enrichment serve to call into question his role in the conspiracy.[11] The Oral Health Enrichment scheme was just one piece of the overall racketeering scheme through which Al-Madani and his coconspirators sought to profit. In addition to evidence that Al-Madani personally profited by work incentives and patient referrals to his private clinic, there was testimony that Al-Madani understood that doing favors for Hills was essential to continuing the stream of benefits from Hills to him. Yazan Karadsheh testified that Al-Madani told him that when it came to Hills and his approval of the referral of patients to their private clinics, "there is nothing for free." (Y. Karadsheh Tr. at 7590.) From this and other evidence, including Al-Madani's own text messages complaining about having to provide things of value to Hills, a jury could have reasonably concluded that Al-Madani was motivated to help Hills conduct the fraudulent activities of Oral Health Enrichment because he believed Hills would continue to benefit Al-Madani in other ways. *See United States v. Riley*, 621 F.3d 312, 332 (3d Cir. 2010), as amended Oct. 21, 2010, ("Even if a benefit to the defendant was required . . . a reasonable jury could have concluded that [the defendant] benefitted through his personal relationship with [a codefendant].") Al-Madani's motion as to Count 8 is DENIED.

---

[11] Solooki also testified that Alqsous did not receive any remuneration from Oral Health Enrichment. (Solooki Tr. at Internal Page No. 58.)

## VI. CONCLUSION

For the foregoing reasons, the motions of defendants, Edward R. Hills, Sari Alqsous, Yazan Al-Madani, and Tariq Sayegh, for judgment of acquittal, and the motion of defendant Sari Alqsous for a new trial, are DENIED.

**IT IS SO ORDERED**.

Dated: December 21, 2018

**HONORABLE SARA LIOI**
**UNITED STATES DISTRICT JUDGE**